364 P.2d 1085

**Richard C. DIBBLEE, Administrator of the Estate of Keith J. Bowen, Deceased, Plaintiff and Appellant,**

**v.**

**DR. W. H. GROVES LATTER–DAY SAINTS HOSPITAL, a corporation, Defendant and Respondent.**

No. 9435.

Supreme Court of Utah.

Oct. 2, 1961.

Rawlings, Wallace, Roberts & 'Black, John L. Black, Salt Lake City, for appellant.

Ray, Quinney & Nebeker, Albert R. Bowen, Salt Lake City, for respondent.

HENRIOD, Justice.

Appeal from a dismissal of plaintiff's complaint. Affirmed with costs to defendant.

Plaintiff alleged three bases for liability in furnishing alleged incompatible blood to deceased, Bowen, who was a patient at the hospital: 1) negligence provable as such, 2) negligence establishable under the res ipsa loquitur doctrine, and 3) by reason of an implied warranty travelling with a sale of the blood.

Under discovery procedure,[1] in answer to the interrogatories put by plaintiff to defendant, the response indicated that before the transfusions, tests by two registered technologists, in duplicate and independent, the blood of the deceased and that of the donors were identical and compatible. Such results were confirmed by two post-transfusion, duplicate, independent tests by two registered technologists, and by a New Jersey Ortho Research Laboratory. In addition to the interrogatory response, plaintiff submitted defendant's statement of account, which was admitted, and which stated "Services * * * to Bowen." Under "Description" charges were noted for "room and care," "supplies," "operating room expense," "laboratory service," "X-ray," "pharmacy," "dressings," "telephone,"

"oxygen" and "transfusions $200 * * * less replacements $———."

Thereafter the negligence and res ipsa loquitur theories were abandoned and plaintiff stood on the implied warranty theory. The allegation was that "the transfused blood was sold * * * for a money consideration" which defendant "impliedly warranted" to be "fit for the use for which it was intended."

After argument, on motion, the complaint was dismissed because "there is no implied warranty wherein a hospital furnishes blood for a transfusion of a patient."

The decision thus invites our consideration of the question whether a hospital, admittedly free from any negligence in the procuration, testing and furnishing of transfusion blood to a patient at his or his physician's behest, nonetheless must respond in damages under an implied warranty theory if a patient responds negatively to the transfusion. To simplify: Does a hospital, *free from negligence*, insure against negative results when it furnishes blood on proper order for transfusion into a patient.

Three cases[2] and one statute[3] have met this problem. All of them say no sale, common-law wise, decisionally or statu-

1. Rule 33, Utah Rules of Civil Procedure.
2. Perlmutter v. Beth David Hospital, 1954, 308 N.Y. 100, 123 N.E.2d 792; Gile v. Kennewick Pub. Hospital Dist., 1956,

48 Wash.2d 774, 296 P.2d 662, 59 A.L.R. 2d 761; Hidy v. State, 1957, 3 N.Y.2d 756, 163 N.Y.S.2d 985, 143 N.E.2d 528.
3. Sec. 1623, Calif.Health & Safety Code.

torily.[4] No authority disputes this conclusion as far as we know. Some unauthoritative case note comments cited by plaintiff, penned by student writers,[5] report the Perlmutter case and suggest some possible kinship to the kind of "trade" in "consumer goods" with that of the shippers in the not cold, but icy channels of trade, but point to no authority to support any such suggestion.

We agree specifically with the conclusion of the cases we cite,—legally virtuous to date,—and generally with their language and logic, to all of which we refer the reader without needless repetition here. Their upshot: That furnishing blood by a hospital at the specific request of a patient or his doctor, and for a charge, is a part of a *service*, not a *sale* in any connotational sense of those terms.

We find support in the California legislative manifestation [6] of approval for what we say and conclude, which appears to extend the rule theretofore laid down in the Perlmutter case. There, recently and in an obvious rejection of any idea that blood may be included in any expanded legislative inclusion of consumer goods as being subjects of insurism against negative consumer physical reaction, it was said, with no ambiguity, that "the procurement, processing, distribution, or use of whole blood, plasma, blood products, and blood derivatives for the purpose of injecting or transfusing the same, or any of them, into the human body" is *not a sale* but *"the rendition of a service."* To the obvious philosophy of this enactment we subscribe. This, in the atmosphere of the windy history of the elusive, confusing "implied warranty" phrase and the sometime but not infrequent superficial distinctions and refinements, according to taste, as to whether it was sired ex contractu or ex maleficio.

We think that practically all hospitals are bourns of mercy and most physicians are unselfish disciples of relief and the cure of human ills. We think of hospitals not as profit-seeking vendors in the market place as might be attributed to General Foods, General Motors, chain stores, super druggeries, national restaurants, or a cereal company that appeals to muscle-building qualities of its food. We do not say that hospitals should be immune from negligence. But we think they should not be strapped with an insurability of blood purity, absent negligence. The argument that public policy demands that the manufacturer of food, the fabricator of machines, the dispenser of meals,—all of whom are self-seeking profit-making beneficiaries of

4. Title 60–1–15, U.C.A.1953 and kindred other state statutes.
5. 29 St. Johns Law Rev. 305, 69 Harv.L. Rev. 391, 103 Pa.L.Rev. 833—all of which were documented *after* Perlmutter but before Gile v. Kennewick (Wash.) which did not even mention the comments.
6. Cf. footnote 3.

the purchaser, should be bound by an implied warranty, reasonably cannot urge inclusion in such category a traditional institution of healing and mercy, because it shelves blood for transfusion purposes, where, perhaps, such storage might be the difference between life and death,—and all of which it furnishes at the cost of procuration, preservation, testing and administration,—for a few pieces of silver. To conclude otherwise could lead to the unhappy and unfortunate conclusion that such institutions, of necessity, might require the patient, (perhaps unconscious) to bring with him his own transfusion blood.

The plaintiff, of necessity, must bottom his claim of recovery on some kind of kinship between a hospital furnishing blood and the commercial enterprise that beseeches the public to buy its products, in preference to its competitors. No hospital gives green trading stamps on the occasion of a blood transfusion as some commodity vendors do, or a car for one having the lucky blood purchase order number. We know of none that fills out forms under any Fair Trades or Unfair Competition Act, U.C.A. 1953, 13–4–1 et seq., 13–5–1 et seq. We are not aware of any that pays a sales tax on furnishing blood, or has a sales or advertising agent, telecasts with commercials, billboard bits of art, health suggestions, or muscle-building come-ons incident to a "sale". We venture that the authorities cited by plaintiff to support an implied warranty have to do with most or at least a lot of the things we mention above, and that hospitals furnishing blood, so far as implied warranty is concerned, are hardly second-cousins to those seeking the public purse for profit, and who, perchance may be liable on a warranty on the occasion of a fly-infested bottle of pop or a broken tooth, suffered by a rock in a roll as was the case in Cushing v. Rodman.[7]

We respect the dissenters' views in the Perlmutter case and consider them as having presented the best possible case for a hospital's absolute insurability for transfusion blood. We note however that they accepted the majority opinion of their Perlmutter colleagues in the two-year later Hidy case,[8] which dealt with the same problem.

The Cutter case[9] upon which counsel leans considerably, is not convincing. It is not a decision of the highest state court. It recognizes it is quite distant from the Perlmutter line of decisions, and makes no pretense as to applicability to the case here.

7. 1936, 65 App.D.C. 258, 82 F.2d 864, 104 A.L.R. 1023.

8. Supra footnote 2.

9. Gottsdanker v. Cutter Laboratories, 1960, 182 Cal.App.2d 602, 6 Cal.Rptr. 320. (Decisions of California District Court of Appeals, no longer are reported in the Pacific Reporter.)

As to arguments anent public policy to protect consumers and distribution of risk, urged by plaintiff, there are more than one school of thought as to whether it is better to protect the health of a publicly invited, purchaser-consumer of food in a profit-making sales market, or the life of an unfortunate, perhaps dying, accident victim who has no choice but to plead, not barter, for emergency relief. We believe the public policy argument may lean more favorably toward favoring the latter.

WADE, C. J., and McDONOUGH and CALLISTER, JJ., concur.

CROCKETT, J., concurs in result.