(Nos. 42526, 42578 cons.—

FRANCES CUNNINGHAM, Appellee, *vs.* MACNEAL MEMORIAL HOSPITAL, Appellant.

*Opinion filed Sept. 29, 1970.—Rehearing denied Dec. 3, 1970.*

444

Underwood, C.J., took no part.

Howard and French, of Chicago, (Richard G. French, of counsel,) for appellant.

Horwitz, Anesi & Ozmon, of Chicago, (Nat P. Ozmon and Dario A. Garibaldi, of counsel,) for appellee.

Harry L. Kinser and Edward J. McLaughlin, of Chicago, and Frank M. Pfeifer, of Springfield, (Mc-Laughlin, Kinser & Bryant and Pfeifer, Fixmer, Gasaway & Ackerman, of counsel,) for *amici curiae* the Illinois Hospital Association *et al.*

KIRKLAND, ELLIS, HODSON, CHAFFETZ & MASTERS, of Chicago, and HASSARD, BONNINGTON, ROGERS & HUBER, of San Francisco, California, (HOWARD HASSARD and DAVID E. WILLETT, of counsel,) for American Association of Blood Banks, *amicus curiae*.

ALBERT E. JENNER, JR., KENNETH J. BURNS, SR., and JEROLD S. SOLOVY, all of Chicago, and PAUL M. ROCA and JAMES MOELLER, of Phoenix, Arizona, (JENNER & BLOCK and LEWIS, ROCA, BEAUCHAMP & LINTON, of counsel,) for Blood Services, *amicus curiae*.

EDWARD J. KIONKA, of Urbana, for The American Trial Lawyers Association, *amicus curiae*.

Mr. JUSTICE CULBERTSON delivered the opinion of the court:

This appeal questions the legal propriety of the application of the strict tort liability theory under the circumstances alleged to be here present and reaches us pursuant to a certificate of importance (see our Rule 316) granted by the appellate court.

Plaintiff's second amended complaint, with the adequacy of which we are here concerned, alleges that the plaintiff, Mrs. Frances Cunningham, was a patient at defendant hospital in May of 1960; that defendant, as a part of its services rendered to plaintiff during her stay, and ancillary thereto, sold and supplied her blood for the purposes of transfusion in the treatment of her condition; that such blood was sold in a container and had been received by defendant in the commercial line of distribution from the Michael Reese Hospital Blood Bank; that the blood supplied by defendant to plaintiff was defective and in an unreasonably dangerous condition at the time it left the hands of defendant and that, as a direct and proximate result of such defect, plaintiff was caused to and did contact serum hepatitis; that such disease required further hospitalization and

medical treatment and resulted in permanent disabilities, damaging the plaintiff in the sum of "$50,000 or such greater or lesser sum as the court or jury may award." Defendant's response to plaintiff's second amended complaint was a motion for judgment based on the contention that the theory of strict liability in tort, as averred in the second amended complaint, does not apply to the transfusion of blood by a hospital as a part of its services rendered to patients. The circuit court of Cook County, agreeing with defendant, allowed its motion and entered judgment for defendant, from which judgment plaintiff appealed to the appellate court. That court, with one justice dissenting, held that the second amended complaint properly stated a cause of action under the strict tort liability theory, and therefore reversed the judgment of the circuit court and remanded the cause for trial. 113 Ill. App. 2d 74.

As noted by the appellate court, the question involved in this case is whether or not the doctrine of strict liability, as set forth by our decision in *Suvada* v. *White Motor Co.,* 32 Ill.2d 612, applies where, as alleged in the plaintiff's second amended complaint, a hospital patient contracts serum hepatitis from blood transfused into her system by the hospital as an ancillary part of the services rendered by the hospital to the patient. Because of the manifest importance and far-reaching effect involved in a judicial disposition of the issues appearing herein, pursuant to leave requested, we have allowed the filing of briefs *amici curiae* by (1) the Illinois Hospital Association, the Chicago Hospital Council and the Illinois State Medical Society; (2) Blood Services, a community blood bank; (3) the American Association of Blood Banks; and (4) the American Trial Lawyers Association. See our Rule 345.

Section 402A of the Restatement (Second) of Torts:
"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby

caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to reach the user or consumer in the condition in which it is sold. (2) The rule stated in subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Defendant initially argues that strict tort liability cannot apply in this case for the reason that whole human blood is not a "product" as that term is contemplated by the Restatement. We must disagree. Comment *e* to the above Restatement section provides that "Normally the rule stated in this Section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. *The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated."* (Emphasis supplied.) (Restatement (Second) of Torts § 402A, Comment *e*.) While whole blood may well be viable, human tissue, and thus not a manufactured article of commerce, we believe that it must in this instance be considered a "product" in much the same way as other articles wholly unchanged from their natural state which are distributed for human consumption. *Community Blood Bank, Inc.* v. *Russell* (Fla.), 196 S. 2d 115, 118-19 (Roberts, J., specially concurring); *cf. United States* v. *Steinschreiber* (S.D.N.Y.) 218 F. Supp. 426; *United States* v. *Calise* (S.D.N.Y.) 217 F. Supp. 705, 708.

It is next urged by defendant that the transfusion of whole blood, as alleged in the second amended complaint, constitutes a "service" as opposed to a "sale" and that thus defendant is not "engaged in the business of selling" blood

as required by *Suvada* in order for strict liability to attach. In this connection much is said in the briefs concerning the mechanics of the acquisition and distribution of whole blood by blood banks and hospitals, from the time it leaves the donor until it reaches the patient. In our judgment, whether or not defendant is engaged in the business of selling whole blood as envisaged by *Suvada* and section 402A of the Restatement (Second) of Torts, cannot be answered in the abstract, devoid of evidentiary basis. The lengthy expositions in the briefs concerning the distribution of blood for transfusion purposes are clearly evidentiary in nature and are thus not properly cognizable in the first instance by a court of review. However, as we have heretofore consistently held, a motion for judgment on the pleadings, as filed by defendant in the circuit court herein, tests the sufficiency of the pleadings as a matter of law (in this case the adequacy of plaintiff's second amended complaint), *and admits the truth of all facts well-pleaded in the pleading of the opposite party. (Milanko v. Jensen, 404 Ill. 261; Schmidt v. Landfield, 23 Ill. App. 2d 55, aff'd 20 Ill.2d 89.)* While it may be arguable that the word "sold" in the second amended complaint is conclusionary in nature and is thus not a well-pleaded factual allegation other than merely indicating the existence of consideration in connection with the transaction (see *Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 123 N.E.2d 792, 793), we believe any defect in this regard is cured by the subsequent use of the word "supplied". At this juncture, then, we must look only to the allegations of the second amended complaint. It is alleged therein "That the defendant * * * as ancillary to the services rendered to the plaintiff sold and supplied her blood for the purposes of transfusion in the treatment of her condition. That said blood was sold in a container and had been received by the defendant in the commercial line of distribution from the Michael Reese Hospital Blood Bank." The question thus becomes whether the supplying of whole blood

for transfusion into a patient by a hospital as an ancillary part of the services rendered to that patient, for which a charge is made, places such hospital in the business of selling blood as envisaged by our ruling in *Suvada* adopting the concept of strict tort liability as the law of Illinois.

Defendant places principal reliance for its position on this issue on the case of *Perlmutter* v. *Beth David Hospital*, 308 N.Y. 100, 123 N.E.2d 792, where, in a four-to-three decision, the Court of Appeals of New York held that the transfusion of blood into a patient by a hospital, as a part of its general services, but for which a separate charge was allegedly made, did not constitute a "sale" under the sales act in force in New York at that time. As a result, there existed no warranty of merchantability or fitness for the purpose intended upon which a plaintiff, who had allegedly contacted serum hepatitis from the blood supplied by the hospital, could predicate a cause of action. The court, in reaching its conclusion, noted that "* * * when one enters a hospital as a patient; he goes there, not to buy medicine or pills, not to purchase bandages or iodine or serum or blood, but to obtain a course of treatment in the hope of being cured of what ails him." (123 N.E.2d at p. 796.) Also, "* * * [t]he art of healing frequently calls for a balancing of risks and dangers to a patient. Consequently, if injury results from the course adopted where no negligence or fault is present, liability should not be imposed upon the institution or agency actually seeking to save or otherwise assist the patient." (123 N.E.2d at p. 795). Cases in accord with *Perlmutter* with regard to the breach of implied warranties are, *e.g., Gile* v. *Kennewick Public Hospital Dist.* (1956), 48 Wash. 2d 774, 296 P.2d 662; *Fischer* v. *Wilmington General Hospital* (1959), 51 Del. 554, 149 A.2d 749; *Goelz* v. *J. K. & Susie L. Wadley Research Institute and Blood Bank* (Tex. Civ. App. 1961), 350 S.W.2d 573; *Dibblee* v. *Dr. W. H. Groves Latter-Day Saints Hospital* (1961), 12 Utah 2d 241, 364 P.2d 1085;

*Sloneker* v. *St. Joseph's Hospital* (D. Colo. 1964), 233 F. Supp. 105; *Koenig* v. *Milwaukee Blood Center, Inc.* (1964), 23 Wis.2d 324, 127 N.W.2d 50; *Whitehurst* v. *American National Red Cross* (1965), 1 Ariz. App. 326, 402 P.2d 584; *Balkowitsch* v. *Minneapolis War Memorial Blood Bank* (1965), 270 Minn. 151, 132 N.W.2d 805; *Lovett* v. *Emory University, Inc.* (1967), 116 Ga. App. 277, 156 S.E.2d 923; and *White* v. *Sarasota County Public Hospital Board* (Fla. Dist. Ct. App. 1968), 206 So.2d 19, *cert.* denied, 211 So.2d 215 (1968). The cases cited from Washington, Delaware, Utah, Colorado, Georgia and Florida were cases against hospitals; those from Texas, Wisconsin, Arizona and Minnesota were cases against blood banks.

Although we do not specifically here deal with the applicability of implied warranties in connection with this transaction, but rather whether the strict tort liability theory may properly be employed by plaintiff, (see *Suvada,* 32 Ill.2d at pp. 620-21) it cannot be gainsaid that the policy considerations marshalled by *Perlmutter* and its progeny are relevant to our decision. With all due respect thereto, however, we are unable to accept the reasoning of the *Perlmutter* majority and those cases from other jurisdictions following it. To assert that the transfusion of whole blood by a hospital into a patient, for which a charge is made, does not give rise to implied warranties because no "sale" is involved is in our judgment simply unrealistic. As noted by the appellate court in this case, quoting from *Russell* v. *Community Blood Bank, Inc.* (Fla. App.) 185 So. 2d 749,) aff'd as modified, *Community Blood Bank, Inc.* v. *Russell,* 196 So.2d 115: " 'It seems to us a distortion to take what is, at least arguably, a sale, twist it into the shape of a service, and then employ this transformed material in erecting the framework of a major policy decision.' " (113 Ill. App. 2d 74, 84-85). Further, as observed by Froessel, J., dissenting in *Perlmutter:* "In the prevailing opinion it is said that the contract alleged in the complaint is 'clearly

one for services' and 'is not divisible'; for 'the patient bargains for, and the hospital agrees to make available, the human skill and physical material of medical science to the end that the patient's health be restored'; and that 'it is immaterial that it is the doctor who may diagnose and treat and the hospital which may supply facilities and material.' We have had no difficulty whatever in the past in frequently distinguishing between medical and administrative acts, even when performed ·by the same person, recognizing that the contract is divisible, and, while we have held hospitals immune when they have carefully selected persons supplying the human skill, we have never extended that doctrine to physical material which was bad, as the impure morphine solution 'unfit for use' in *Volk* v. *City of New York,* 284 N.Y. 279, 30 N.E.2d 596, 597; the defective hot water bag in *Iacono* v. *New York Polyclinic Med-School & Hospital,* 269 App. Div. 955, 58 N.Y.S.2d 244, affirmed 296 N.Y. 502, 68 N.E.2d 450; and the defective chair in *Holtfoth* v. *Rochester General Hosp.,* 304 N.Y. 27, 105 N.E.2d 610, 31 A.L.R.2d 1113." 123 N.E.2d at p. 798; see also Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn. L. Rev. 791, 811; *Hoffman* v. *Misericordia Hospital of Philadelphia,* 439 Pa. 501, 267 A. 2d 867.

Further, that providing blood for patients is not a hospital's principal function clearly cannot determine, as maintained by defendant, whether it is engaged in the business of selling a product (*i.e.,* blood) for purposes of the imposition of strict liability. Thus, as set forth in the Restatement: "*f. Business of Selling.* The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or

ice cream, either for consumption on the premises or in packages to be taken home." (Restatement (Second) of Torts, § 402A, Comment *f*.) In light of the foregoing, we fail to see any real distinction to be drawn between, for example, a blood bank, which provides hospitals with blood, and a hospital, which, as alleged here, in turn provides blood for immediate transfusion into its patients, insofar as the theory of strict liability is concerned. Although it may be conceded that a blood bank's *principal function* is to stockpile blood for dispensation to various institutions, whereas a hospital ordinarily provides blood for transfusion purposes only ancillarily and as a part of its total services, both entities are clearly within the distribution chain of the product involved. We thus disagree with the opinion rendered by the Florida District Court of Appeal in *White* v. *Sarasota County Public Hospital Board,* 206 So.2d 19, *cert.* denied 211 So.2d 215, which refused to charge a hospital with an implied warranty as to the fitness of blood transfused into a patient, while recognizing the applicability of that theory against a blood bank. That court felt that the hospital was performing a service, as opposed to the function of a blood bank, "* * * which originally collects and distributes the commodity * * *." 206 So.2d at p. 21.

We have heretofore abolished charitable immunity insofar as that doctrine insulated not-for-profit hospitals from the consequences of their negligence (*Darling* v. *Charleston Memorial Hospital,* 33 Ill.2d 326, *cert.* denied, 383 U.S. 946, and we see no good reason for engrafting, judicially, an exception in their favor onto the strict tort liability theory (*cf. Community Blood Bank Inc.* v. *Russell* (Fla.), 196 So.2d 115, 121 (Roberts, J., specially concurring)), which, in effect, defendant would have us do. We hold that if the allegations of the second amended complaint are true, which, as we have seen, for our purposes here they are, there can be no question that defendant is engaged in the business of "selling" whole blood for transfusion into pa-

tients as that requirement is contemplated under our ruling in *Suvada*. We are not dissuaded from this view by the fact that, as pointed out in the briefs, the legislatures of some twenty-five States have taken a contrary position. See, *e.g.,* Alaska: Chapter 88-45.05.100 (1968); California: Health & Safety Code, par. 1623 (1955); Florida: Fla. Stat. Ann., par. 672.2-316(5) (1969) (purporting to overrule *Community Blood Bank, Inc.* v. *Russell* (Fla.), 196 So.2d 115); Massachusetts: General Laws, ch. 106, par. 2—316 (1965). We believe no logical distinction can be made between the facts alleged in the second amended complaint and those ordinarily involved in the dispensation of drugs and other medications by hospitals or other entities, where injury or disease resulting from the existence of deleterious contaminants therein would most assuredly result in the application of the strict liability theory.

Defendant further asserts that the state of medical science is such that there are absolutely no means by which the existence of serum hepatitis virus can be detected in whole blood, and that it should thus not be held strictly liable for injury caused thereby. Whatever be the state of the medical sciences in this regard, we disagree with defendant's conclusion. The Restatement provides in section 402A(2)(a) that "[t]he rule stated in subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product." To allow a defense to strict liability on the ground that there is no way, either practical or theoretical, for a defendant to ascertain the existence of impurities in his product would be to emasculate the doctrine and in a very real sense would signal a return to a negligence theory. Again, as stated by Roberts, J., specially concurring in *Community Blood Bank, Inc.* v. *Russell* (Fla.), 196 So.2d 115, 119-20: "It may be conceded that, in the present state of our scientific knowledge, the virus of serum hepatitis cannot be detected in the donor or in the whole blood after it is taken, but neither is there any practical

way of discovering a defect in a tin of canned meat [citations], or in a candy bar sealed in a paper wrapper [citations], or in a bottle drink [citation], or typhoid bacilli in clams [citation]. In each of these cases the presence of the adulterating substance could not have been discovered without destroying the salability of the product. * * * These decisions stand for the proposition that the seller of a product intended for human consumption is liable for injurious consequences resulting from the consumption of a defective or adulterated product, even though it was at the time of the sale and consumption of such product practically or scientifically impossible to discover the defect in or adulteration of such product."

In Wade, Strict Tort Liability of Manufacturers (1965), 19 Sw. L.J. 5, 13, 15, it is said that strict liability "* * * is strict in the sense that there is no need to prove that the manufacturer was negligent. If the article left the defendant's control in a dangerously unsafe condition (or if it failed to comply with the implied warranty), the defendant is liable whether or not he was at fault in creating that condition or in failing to discover and eliminate it. * * * Thus, the test for imposing strict liability is whether the product was unreasonably dangerous, to use the words of the Restatement. Somewhat preferable is the expression, 'not reasonably safe.' It has been suggested that this amounts to characterizing the product rather than the defendant's conduct. This is quite true, but it is easy to phrase the issue in terms of conduct. Thus, assuming that the defendant had knowledge of the condition of the product, would he then have been acting unreasonably in placing it on the market? This, it would seem, is another way of posing the question of whether the product is reasonably safe or not. And it may well be the most useful way of presenting it." Further, as relevantly observed by the Federal Circuit Court of Appeals in *Kenower* v. *Hotels Statler* (6th cir.), 124 F.2d 658, 660,

in an implied warranty case where the plaintiff had contracted typhoid fever as the result of his ingestion of contaminated clams: "No negligence was shown in this case. It is impossible to ascertain whether clams are infected with typhoid bacilli, unless each clam is subjected to a bacteriological examination by microscope. The health of an infected clam is not affected by the bacilli. In all tests other than microscopic—such as striking the clams together to ascertain soundness—infected clams appear healthy. Obviously, it is impossible for producers or vendors of clams to know that they are not infected with typhoid. The most that can be done to insure that clams are fit for human consumption, without destroying the marketability of the product, is to use the highest degree of care to see that they grow in healthy beds and in uncontaminated water."

The appellate court majority properly held that, in the posture in which this case was presented to it, no determination could be made as to whether it was theoretically possible to ascertain the existence of hepatitis virus in whole blood at the time of plaintiff's alleged injury. It then stated that "* * * [t]he defendant hospital may choose to defend its position at trial on the ground that blood is incapable of being made safe and we will not make any statement or point beyond the issue presently before this court." (113 Ill. App. 2d at p. 86.) In accordance with what we have herein said on this point, however, and to save defendant from the expense and effort of introducing irrelevant evidence on the trial of this cause, we believe that whether or not defendant can, even theoretically, ascertain the existence of serum hepatitis virus in whole blood employed by it for transfusion purposes is of absolutely no moment. Any other ruling would be entirely inconsistent with the concept of strict tort liability.

Interwoven with defendant's argument that, because of the alleged impossibility of discovering this defect in blood

it should not be held strictly liable, is the further contention that the facts pleaded in the second amended complaint give rise to a recognized exception to the rule of strict liability. In this connection, Comment *k.* to section 402A of the Restatement (Second) of Torts, upon which reliance is placed by defendant, provides as follows: *"k. Unavoidably Unsafe Products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified * * *. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous * * * [Emphasis in original]." We believe it clear that the exception set forth in the quoted comment relates only to products which are not impure and which, even if properly prepared, inherently involve substantial risk of injury to the user. Such exception cannot avail where, as here, the product is alleged to be impure. There can be no question that blood containing hepatitis virus is "in a defective condition unreasonably dangerous to the user or consumer * * *." (Restatement (Second) of Torts, 2d, § 402A(1)), and we accordingly hold that the allegations of the second amended complaint do not come within the exception contended for by defendant. *Community Blood Bank, Inc.* v. *Russell* (Fla.), 196 So.2d 115, 118-21, (Roberts, J., specially concurring) ; see also *Gottsdanker* v. *Cutter Laboratories,* 182 Cal. App. 2d 602, 6 Cal. Rptr. 320; *Grinnell* v. *Charles Pfizer & Co.* (Cal. App.), 79 Cal. Rptr. 369, where defendants were held liable for disseminating impure and, thus defective, polio vaccine; Boland, Strict

Liability in Tort for Transfusing Contaminated Blood, 23 Ark. L. Rev. 236, 241-45 (1969).

Defendant implicitly raises the *ad terrorem* argument that allowing a strict tort liability theory to obtain in this case will "open the flood gates" to disastrous litigation which will ultimately thwart the fulfillment of the hospitals' worthy mission by drainage of their funds for purposes other than those intended. Our answer to this contention is that (paraphrasing what we observed in *Molitor v. Kaneland Community Unit Dist.*, 18 Ill.2d 11, 38, and quoted in *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 336) we do not believe in this present day and age, when the operation of eleemosynary hospitals constitutes one of the biggest businesses in this country, that hospital immunity can be justified on the protection-of-the-funds theory. The concept of strict liability in tort logically, and we think, reasonably, dictates that an entity which distributes a defective product for human consumption, whether for profit or not, should legally bear the consequences of injury caused thereby, rather than allowing such loss to fall upon the individual consumer who is entirely without fault.

In conclusion, we believe that the second amended complaint adequately states a strict tort liability action. It is alleged therein that a product (blood) was sold or supplied, for consideration, to the plaintiff by an enterprise which is in the business, albeit incidentally with regard to its principal function, of supplying such product, that the product contained a defect (serum hepatitis virus) at the time it left the hands of the hospital which rendered it unreasonably dangerous to the plaintiff, a consumer, and which proximately caused physical damage to her. All of the requirements set forth in *Suvada* have thus been met. Accordingly, and for the reasons stated, the judgment of the Appellate Court, as modified herein, is affirmed, and the cause is

remanded to the circuit court of Cook County with instructions to order the filing of defendant's answer to the second amended complaint and to proceed to trial in accordance with the views herein expressed.

> *Judgment, as modified, affirmed, and cause remanded, with directions.*

Mr. CHIEF JUSTICE UNDERWOOD took no part in the consideration or decision of this case.